# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**TERRI YVONNE BUTLER,**

   **Plaintiff,**

  v.             Civil Action No.: 5:11-cv-150

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

   **Defendant.**

## REPORT AND RECOMMENDATION
## THAT CLAIMANT'S MOTION FOR SUMMARY JUDGMENT BE DENIED AND
## COMMISSIONER'S MOTION FOR SUMMARY JUDGMENT BE GRANTED

## I. Introduction

A. Background

Plaintiff, Terri Yvonne Butler ("Claimant"), filed her Complaint on October 26, 2011 seeking judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant, Commissioner of Social Security ("Commissioner").[1] Commissioner filed his Answer on March 8, 2012.[2] On April 10, 2012, Claimant filed a Motion for Summary Judgment.[3] On May 5, 2012, Commissioner filed a Motion for Summary Judgment.[4]

B. The Pleadings

  1.  Claimant's Motion for Summary Judgment & Memorandum in Support

  2.  Commissioner's Motion for Summary Judgment & Memorandum in Support

---

[1] Dkt. No. 2.

[2] Dkt. No. 14.

[3] Dkt. No. 17.

[4] Dkt. No. 19.

C.  Recommendation

I recommend that:

1.  Claimant's Motion for Summary Judgment be **DENIED** because substantial evidence supports the ALJ's decision that there are significant jobs in the national economy the Claimant can perform.

2.  Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II.  Facts

A.  Procedural History

Claimant filed an application for Disability Insurance Benefits on February 5, 2009, alleging disability since October 15, 2008 due to breast cancer, depression, anxiety, anxiety aggression, left arm nerve damage and pain, and stomach ulcers. (Tr. 143, 145 ). The application was initially denied on August 4, 2009 and on reconsideration on December 16, 2009. (Tr. 88, 93, 101, 104). On January 25, 2010, Claimant requested a hearing before an ALJ and the hearing was held on March 22, 2011 in Morgantown, West Virginia. (Tr. 36).

On April 14, 2011, the ALJ issued a decision adverse to Claimant finding that she was not under a disability within the meaning of the Social Security Act. (Tr. 14-25). On June 14, 2011, Claimant requested review by the Appeals Council, however on August 25, 2011, the Appeals Council denied Claimant's request for review. Claimant filed this action, which proceeded as set forth above, having exhausted her administrative remedies.

B.  Personal History

Claimant was born on June 16, 1966 and was 42 years old on the date of the March 22, 2011 hearing before the ALJ. (Tr. 106). Claimant has a high school education. (Tr. 296). Claimant has past work experience as a video store owner, waitress, a house keeper, and an employee in the septic business. (Tr. 34, 339).

C.  Medical History

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's finding that Claimant is not under a disability and can still perform work in the national economy:

On October 22, 2008, Claimant reported to Dr. Darla Piggott that she noticed a lump in her left breast approximately four months before her appointment. (Tr. 244). The doctor also prescribed her Celexa and Ativan for depression and anxiety. (Tr. 244). On October 23, 2008, a mammogram at Braxton County Memorial Hospital revealed a large cluster of microcalcifications in the left breast. (Tr. 255). A biopsy performed by Dr. Todd Witsberger revealed intermediate grade intraductal carcinoma with comedo necrosis. The tumor was also present in all three tissue cores. (Tr. 245). On November 10, 2008, Dr. Witsberger performed a left breast mastectomy. (Tr. 383-84).

In her follow-up appointment on January 9, 2009, Claimant told Dr. Witsberger that she was experiencing pain in the upper left pectoralis and numbness in the upper left extremity. He prescribed heat, ibuprofen, and reduced physical activity. (Tr. 378).

On June 17, 2009, at the request of the Social Security Administration, Dr. Miraflor Khorshad evaluated Claimant. She reported having fatigue, stomach pain, crying spells, mood

swings, agoraphobia, insomnia, and numbness, pain and swelling in the left arm. (Tr. 288). Dr. Khorshad found she had recurrent pain and swelling in her left arm, pneumoperitoneum, mood disorder, limited abduction of the left shoulder, and possibly bi-polar disorder. (Tr. 290-91). However, her gait was normal, she could get onto the examination table without assistance, she could walk on her heels and toes, she could sit and squat, her range of motion was normal, she had no joint swelling or effusion, and all her sensory modalities were intact. (Tr. 288-92).

On July 13, 2009, consultative psychologist Larry Legg, M.A. examined Claimant at the request of the Social Security Administration. (Tr. 294). Claimant reported that she was restless, fatigued, had poor concentration, and was not sleeping well. (Tr. 295). She was diagnosed with major depressive disorder, single episode, severe without psychotic features, and she was diagnosed with generalized anxiety disorder. (Tr. 297). However, he noted that she had never been hospitalized for any mental disorder, she was well dressed and groomed, she was cooperative and police, her speech was normal in tone, her stream of thought and thought content were normal, her judgment was normal, she had no suicidal ideations, her immediate and remote memory was only mildly deficient, her immediate memory was normal, her persistence as within normal limits, her pace was only mildly deficient, and her social functioning was only mildly deficient. (Tr. 293-96).

On July 20, 2009, medical consultant J. Rabelo found that Claimant could lift 20 pounds occasionally and 10 pounds frequently, and was limited to occasional reaching with the left arm in all directions including overhead. (Tr. 311). On July 23, 2009, Jim Capage, Ph.D., a West Virginia State agency psychologist found that she had the mental-emotional capacity to perform routine work-related activities in a low-pressure setting that requires no more than occasional

4

and superficial social interaction. (Tr. 332). In December 2009, Caroline Williams, M.D., reviewed these findings and affirmed the functional analysis. (Tr. 335).

On October 27, 2010, Dr. Witsberger found that Claimant had recovered well from her mastectomy, had no recurrence of cancer, and would remain on Tamoxifen. (Tr. 374). On December 15, 2010, a mammogram showed no signs of neoplasm. (Tr. 373).

On January 23, 2011, Laura Bickett, Ph.D., performed a psychological evaluation. She noted that Claimant's self-consciousness and concern for having a public panic attack have led her to rely increasingly on her daughter. (Tr. 339). Dr. Bickett diagnosed her with major depressive disorder, recurrent, severe without psychotic features, panic disorder with agoraphobia and generalized anxiety disorder. (Tr. 341).

On March 15, 2011, Claimant again went to see Dr. Gant, nee Piggott, who noted that she had an unhealthy dependent relationship with her daughter. (Tr. 358). She was diagnosed with depression with anxiety, panic disorder, acute stress reaction, insomnia, and alcohol abuse. (Tr. 358). On March 23, 2011, Claimant again saw Dr. Gant with complaints of insomnia and vomiting. She was diagnosed with insomnia and depression with anxiety, but the doctor noted that she seemed to be doing better and that her mood and affect were normal. (Tr. 365).

D.  Testimonial Evidence

Testimony was taken at the hearing held on March 22, 2011. The following portions of the testimony are relevant to the disposition of the case:

Claimant testified that, as a result of her mastectomy, her left arm goes numb if she uses it and sometimes it starts swelling if she lifts something. (Tr. 56). She testified that the swelling occurs two to three times per week and it can last anywhere from a few hours to all day or all

5

night. (Tr. 57, 67). In order for the swelling to go down she has to lie on her back with a pillow under her arm. (Tr. 67). The numbness causes her to drop things like glasses and other dishes. (Tr. 67).

Claimant also gave testimony about her panic attacks. She said that sometimes she will experience panic attacks every day for a week. (Tr. 59). She also testified that they can last anywhere from half an hour to until she takes medication for them. (Tr. 59). She testified that she is currently taking Restoril to sleep, Buspar for anxiety, and Zoloft for depression, as well as the Tamoxifen for treatment and prevention of breast cancer. (Tr. 62). Until recently, however, it had been over a year since she had taken any medicine for depression. (Tr. 65).

At the hearing, a vocational expert ("VE") also gave testimony. The ALJ posed the following hypothetical to the VE:

> [A]ssume a hypothetical individual of the same age, education and work experience as the claimant who retains the capacity to perform light work with the following limitations: no more than occasional left upper extremity reaching in all directions including overhead, noting that the left side is dominant; should be no more than routine work-related activities in a low-stress environment defined as having only occasional decision making required and only occasional changes in the work setting; should be only occasional and superficial interaction with the public, coworkers, and supervisor; and work should require no more than minimal very basic math skills. Can such an individual perform the past work of the claimant as it was actually performed or as it is customarily performed per the DOT?

(Tr. 75-76)

The VE then responded no.

The ALJ then asked if there are other jobs in the regional or national economy that such an individual can perform, and the VE responded:

> [A]t the light level, that hypothetical individual, your honor, I believe could function as an office assistant, light and unskilled, 150,000 nationally, 1,850 regionally. And the DOT on that would be 239.567-010, its light and unskilled. And also some bench assembly positions. That's 706.684-022. 400,000 nationally and 2,000 regionally.

6

(Tr. 76).

The ALJ then added additional limitations to the first hypothetical that he posed to the VE:

> [A]ssume that same hypothetical individual with the same non-exertional limitation, but who retains the capacity to perform some sedentary work. Are there jobs in the regional or national economy such an individual can perform?

(Tr. 77).

The VE responded:

> [A]t the sedentary level, that hypothetical individual I believe could function as a general sorter, sedentary and unskilled, 50,000 nationally, 550 regionally. And also at the sedentary level there are assembler jobs with that classification to sedentary and unskilled: 149,000 nationally, 1,450 regionally.

(Tr. 77).

The VE went on to specify that the DOTs for those were 713.687-018 and 209.687-022.

Then the ALJ asked:

> Would you assume a hypothetical individual retains– with the limitations described in Exhibit 14F pages 7 through 10, are there jobs in the regional or national economy that such an individual could perform?

(Tr. 78).

The VE Responded:

> No, your honor. What impresses me here is there are 20 categories that are evaluated, and 14 of 'em are markedly limited. And I think when you have that in combination, that would completely eliminate competitive work.

(Tr. 78).

Then the ALJ asked:

> If I conclude that the claimant would need to exceed one or more of these tolerances [for being later, having unexcused or unscheduled absences, for taking numerous breaks of various lenghts, and for being off task], what would the result be?

(Tr. 79).

The VE responded that the individual would not be able to keep a job.

E.      Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

Claimant is single and has been divorced for twenty years. (Tr. 48). She has two children, one who is 27 and lives outside the home, and one who is 18 and lives with her. (Tr. 48, 339). She has a driver's license but she does not have a car, however she is able to borrow her mother's car to run errands. (Tr. 49). Claimant does dishes, dusts, makes the bed, does laundry, cooks, goes grocery shopping, watches television, and drives. (Tr. 65-66, 193-95). She does not engage in any social activities, however, she does not have difficulty getting along with family, friends, neighbors, or authority figures. (Tr. 196-98). Her mother comes two to three times per week to help her, or if Claimant's daughter is not there to help her, she will come every day. (Tr. 70).

She currently receives food stamps and has a medical card. She was also receiving child support at the time of the hearing, but would not be for much longer. (Tr. 52).

### III.  The Motions

A.   <u>Contentions of the Parties</u>

Claimant's brief alleges that the ALJ erred in finding that there are jobs in significant numbers in the national economy that Claimant can perform given her impairments.

Commissioner contends that substantial evidence supports the ALJ's decision that there are jobs in significant numbers in the national economy that Claimant can perform given her impairments.

B.  The Standards.

   1.  Summary Judgment.  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

   2.  Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

C.  Discussion

1.  Whether the ALJ Erred by Posing a Hypothetical to the VE that did not Include all of Claimant's Limitations

   Claimant first argues that the hypothetical question posed to the VE did not include Dr. Capage's conclusion that she was "moderately limited" in the areas he noted in Section I of the Mental Residual Functional Capacity Assessment. As the Social Security Administration's guidelines, called the Program Operations Manual System ("POMS"), explain: "**Section I is merely a worksheet** to aid in deciding the presence and degree of functional limitations and the

9

adequacy of documentation and **does not constitute the RFC assessment**." POMS DI 24510.060. It also explains "**Section III– Functional Capacity Assessment**, is for recording the mental RFC determination. It is in this section that the **actual metal RFC assessment is recorded**, explaining the conclusions indicated in Section I." Id. See also Smith v. Comm'r of Soc. Sec., 631 F.3d 632, 636-37 (3rd Cir. 2010); Molly v. Astrue, No. 08-4801, 2010 WL 421090, at *11 (D.N.J. Feb. 1, 2010). ("[The ALJ] was not required to assign *any* weight to this part of the report because it was not the final RFC finding.")(internal quotations and citations omitted); Liggett v. Astrue, No. 08-1913, 2009 WL 189934, at *8 (E.D. Pa. Jan. 27, 2009)("[The doctor's] actual mental residual functional capacity assessment [was located] in Part III of the Mental Residual Capacity Form and that "the undersigned does not accept the summary conclusions in Part I as the assessment of the claimant's residual functional capacity here"); Torres v. Comm'r of Soc. Sec., No. 07-1951, 2008 WL 5244384, at *12 (D.N.J. Dec 15, 2008)("[T]he check blocks in Section I of the assessment do not constitute the assessment itself"). Importantly, by the Social Security Administration's own guidelines, Section III is the place where the doctor "explain[s] the conclusions indicated in Section I," thus it is unremarkable that the doctor would refer to Section I when writing his narrative in Section III. POMS DI 24510.060. Accordingly, the limitations indicated by Dr. Capage in Section I of the form do not constitute Claimant's actual RFC, and therefore they did not have to be included in the hypothetical to the VE.

Furthermore, even assuming *arguendo* that the ALJ should have interpreted doctor Capage's assessment as indicating moderate limitations because he mentioned them in Section III, the ALJ did not misapply the facts to the governing standards. A moderate limitation in a

functional area indicates a severe but not presumptively disabling impairment. White v. Barnhart, 454 F.Supp. 2d 609, 615 (E.D. Tex. 2006). See also 20 C.F.R. § 404.1520a(D)(1)-(3). Mental impairments are evaluated according to a five-point scale including "none, mild, moderate, marked, and extreme" with only "the last point represent[ing] a degree of limitation that is incompatible with the ability to do any gainful activity." See 20 C.F.R. § 404.1520a(c)(4). Accordingly, even if the ALJ should have included moderate limitations in his hypothetical, there is no evidence that the outcome would have been different.

2. <u>Whether the ALJ Erred by crediting the VE's Testimony that there are Jobs in Significant Numbers in the National Economy that Claimant can do Given her Limitations with Reaching in all Directions with her Left, Dominant Arm Along and her Depression and Anxiety</u>

Claimant asserts that the ALJ erred in relying on the VE's testimony that there are jobs in significant numbers Claimant can perform because his testimony is not consistent with the Selected Characteristics of Occupations Listed in the Dictionary of Occupational Titles ("SCO"). Claimant argues he identified jobs which require frequent reaching instead of occasional reaching.

At the outset, this Court notes that there is no conflict between the DOT and the SCO because both of them state that the occupations at issue require frequent reaching. If Claimant is attempting to argue that the two are in conflict with each other, this argument is without merit. Then, the Court notes that the VE was instructed to identify jobs for an individual who could perform "occasional reaching in all directions with the <u>left, dominant arm</u>." (Tr. 75)(emphasis added). Here, although the ALJ identified Claimant's limitation regarding occasional reaching with the left arm, no such restrictions were identified with respect to the use of the right arm. See Davis v. Astrue, No. EDCV 11-1386-OP, 2012 WL 1067937, at *3 (C.D. Cal. March 29, 2012).

There is nothing in the DOT that expressly states the jobs identified by the VE require frequent reaching with both arms. Id. Nor did the testimony of the VE give any indication that any of the occupations required frequent reaching with both hands. Id. See also Carey v. Apfel, 230 F.3d 131, 146 (5th Cir. 2000)(individual with use of only one arm could perform the jobs of cashier and ticket taker, even though jobs required fingering and handling ability; DOT does not have requirement of bilateral fingering and handling); Diehl v. Barnhart, 357 F.Supp. 2d 804, 822 (E.D.Pa. 2005)(Individual with limited use of one arm could perform jobs requiring frequent reaching, handling and fingering, and therefore there was not conflict between DOT and vocational expert's testimony to that effect); Feibusch v. Astrue, No. 07-00244 BMK, 2008 WL 583554, at *5 (D.Haw. Mar. 4, 2008)(citations omitted)([T]he use of two arms is not necessarily required for jobs that require reaching and handling."); McConnell v. Astrue, No. EDCV 08-667 JC, 2010 WL 1946728, at *7 (C.D. Cal. May 10, 2010). Accordingly, there is no inconsistency between the VE's opinion and the DOT descriptions of the jobs. Thus, the Court must find that Claimant's argument is without merit.

For the above reasons, Claimant's assertions do not warrant relief.

### IV.  Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be **DENIED.**

2. Commissioner's Motion for Summary Judgment be **GRANTED**.

Any party who appears *pro se* and any counsel of record, as applicable, may, on or before **June 7, 2012**, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A

copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: May 24, 2012

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE